**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELVENIA LATSON,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| v.    ) | Civil Action No. 14-371 (RBW) |
| ) | |
| JEFF SESSIONS, Attorney General    ) | |
| of the United States,[1]    ) | |
| ) | |
| Defendant.    ) | |
| ) | |
| ) | |
| ELVENIA LATSON,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| v.    ) | Civil Action No. 14-1892 (RBW) |
| ) | |
| JEFF SESSIONS, Attorney General    ) | |
| of the United States,    ) | |
| ) | |
| Defendant.    ) | |

**MEMORANDUM OPINION**

The pro se plaintiff, Elvenia A. Latson, brings these two civil actions[2] against Jeff

Sessions, in his official capacity as the Attorney General of the United States Department of

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Jeff Sessions has been automatically substituted as the defendant in these matters.

[2] The plaintiff's two complaints assert nearly identical employment discrimination causes of action against the government based on a common set of facts.  In Latson v. Sessions, No. 14-371 ("Latson I"), the plaintiff alleges

(continued . . . )

Justice, alleging that the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "Bureau") discriminated against her on the bases of her race, gender, and color, retaliated against her due to her pursuit of earlier statutorily protected activity, and has engaged in a practice of promoting employees that has a disparate impact on African Americans and women, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 (2012) ("Title VII").  Complaint ¶¶ 1, 5–6, 11–13, 27–40, Latson v. Sessions, No. 14-371 ("Latson I Compl."); Complaint ¶¶ 1, 5, 11–14, 35–48, Latson v. Sessions, No. 14-1892 ("Latson II Compl."). Currently before the Court are the Defendant's Motions for Summary Judgment, see Defendant's Motion for Summary Judgment at 1, Latson v. Sessions, No. 14-371 ("Latson I Def.'s Mot."); Defendant's Motion for Summary Judgment at 1, Latson v. Sessions, No. 14-1892 ("Latson II Def.'s Mot.").  Also currently before the Court is the plaintiff's Motion to Strike Defendant's Response to Plaintiff's Statistical Evidence ("Pl.'s Mot.").  Upon careful consideration of the parties' submissions,[3] the Court concludes that it must grant the defendant's motions, deny the plaintiff's motion, and enter summary judgment in favor of the defendant in both cases.

---

( . . . continued)

that the government discriminated against her based on her race, gender, and color, and retaliated against her when it declined to select her for two vacant Supervisory Industry Operations Investigator positions to which she applied in Jacksonville, Florida and Harrisburg, Pennsylvania.  Latson I Complaint ¶¶ 5, 11–13.  In Latson v. Sessions, No. 14-1892 ("Latson II"), the plaintiff alleges that the government committed the same violations when it declined to select her for three vacant Supervisory Industry Operations Investigator positions to which she applied in Jacksonville, Florida, Tucson, Arizona, and Greensboro, North Carolina, and she asserts a disparate impact claim based on race and gender as a result of her non-selection.  Latson II Complaint ¶¶ 1, 5, 11–14.  Federal Rule of Civil Procedure 42(a) permits a district court to consolidate cases that "involve a common question of law or fact," Fed. R. Civ. P. 42(a), and therefore, in the interest of judicial economy, the Court exercises its discretion to consolidate these cases sua sponte due to the existence of common questions of both law and fact.  See Nat'l Ass'n of Mort. Brokers v. Bd. of Governors of Fed. Reserve Sys., 770 F. Supp. 2d 283, 286 (D.D.C. 2011) ("Consolidation pursuant to Rule 42(a) is permissive and vests a purely discretionary power in the district court, which may consolidate related cases sua sponte.").

[3] In addition to the filings previously identified, the Court considered the following submissions in reaching its decision: (1) the Defendant's Statement of Material Facts to Which There Is No Genuine Dispute, ("Latson I Def.'s Facts"); (2) the Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Latson I Def.'s Mem."); (3) the Defendant's Statement of Material Facts to Which There Is No Genuine Dispute

(continued . . . )

# I.      BACKGROUND

The plaintiff, an African-American female, has worked for the Bureau since 1990 and is currently a GS-13 Industry Operations Investigator in the Bureau's Tallahassee Satellite Office of its Tampa Field Division.  <u>Latson I</u> Compl. ¶¶ 1, 10; <u>Latson II</u> Def.'s Facts ¶ 1.  "[I]n 2000 or 2001," the plaintiff filed a complaint with Bureau's Equal Employment Opportunity ("EEO") Office, which "was resolved through EEO counseling."  Latson <u>II</u> Def.'s Mot., Ex. F (Declaration of Elvenia A. Latson ("<u>Latson II</u> Latson Decl.")) ¶ 5.  In 2007, the plaintiff filed another EEO complaint, which resulted in a settlement agreement on September 22, 2008.  <u>See Latson I</u> Def.'s Mot., Exhibit ("Ex.") S (Declaration of Robynn F. Ferguson Russ ("<u>Latson I</u> Ferguson-Russ Decl.")) ¶ 4.

In 2009, the plaintiff applied for two vacant Supervisory Industry Operations Investigator positions: one located in Jacksonville, Florida; and the other located in Harrisburg, Pennsylvania.  <u>Latson I</u> Compl. ¶¶ 11–13; <u>Latson I</u> Def.'s Facts ¶ 2.  The Merit Promotion Board ("the Board"), the entity tasked with selecting all Bureau "competitive supervisory positions . . . for the GS-14 and GS-15 levels," <u>see Latson I</u> Compl. ¶ 14; <u>Latson II</u> Def.'s Facts ¶ 4, interviewed the plaintiff for the 2009 Jacksonville vacancy on August 12, 2009, <u>see Latson I</u> Def.'s Mot., Ex. E (Declaration of Elvenia A. Latson ("<u>Latson I</u> Latson Decl.")) ¶ 7.A, and selected Paul Brown, a white male, <u>see Latson I</u> Compl. ¶ 26; <u>Latson I</u> Def.'s Facts ¶ 15, who was rated as the "top candidate" for the position on August 13, 2009, <u>see id.</u>, Ex. H (2009 Jacksonville Merit

---

( . . . continued)
 ("<u>Latson II</u> Def.'s Facts"); (4) the Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("<u>Latson II</u> Def.'s Mem."); (5) the Plaintiff's Response to Defendant's Motion ("Pl.'s Opp'n"), which is identical in both cases; (6) the Defendant's Omnibus Reply in Support of its Two Motions for Summary Judgment ("Def.'s Reply"), which is identical in both cases; (7) the plaintiff's Statistical Evidence Establishing Four Fifths or 80 % Rule in Determining Adverse Impact on a Protected Group ("Pl.'s Stats."), which is identical in both cases; (8) the plaintiff's Statistical Evidence Establishing Fourth Fifths or 80 % Rule in Determining Adverse Impact on a Protected Group ("<u>Latson II</u> Pl.'s Updated Stats."); and (9) the Defendant's Response to Plaintiff's Introduction of "Statistical Evidence" (ECF No. 27) ("<u>Latson II</u> Def.'s Stats. Resp.").

Promotion Board Deliberations ("2009 Jacksonville Deliberations")) at 1.  The Board

interviewed the plaintiff for the Harrisburg vacancy on December 17, 2009, see Latson I Def.'s

Mot., Ex. E (Latson Decl.) ¶ 23.A, and selected Ernest Lintner, a white male, see Latson I

Compl. ¶ 26; Latson I Def.'s Facts ¶ 23, who was rated as the "top candidate" for the position on

December 17, 2009.  See Latson I Def.'s Mot., Ex. Y (Harrisburg Merit Promotion Board

Deliberations ("Harrisburg Deliberations")).

On December 30, 2009, following her non-selections for the Harrisburg and 2009

Jacksonville positions, the plaintiff filed a complaint with the Bureau's EEO Office, alleging

"unlawful discrimination based on her race, [gender], and unlawful retaliation for [having

engaged in] protected activities."  Latson I Compl. ¶ 6; Latson I Def.'s Mem. at 6.  Following an

investigation, the matter was assigned to an Equal Employment Opportunity Commission

("EEOC") Administrative Law Judge, who "issued a Decision in favor of the [Bureau] on

October 22, 2013."  Latson I Compl. ¶ 7; Latson I Def.'s Mem. at 6.  On December 4, 2013, the

Department of Justice issued a Final Agency Decision affirming and adopting the EEOC's

determination.  Latson I Compl. ¶ 8; Latson I Def.'s Mem. at 6.

In 2012, the plaintiff applied for three additional vacant Supervisory Industry Operations

Investigator positions: one located in Jacksonville, Florida; one located in Tucson, Arizona; and

one located in Greensboro, North Carolina.  Latson II Compl. ¶¶ 11–14; Latson II Def.'s Facts

¶ 2.  The Board interviewed the plaintiff for the 2012 Jacksonville vacancy on September 20,

2012, see Latson II Def.'s Mot., Ex. F (Latson II Latson Decl.) ¶ 7, and selected Margaret

Carvill, a white female, see Latson II Compl. ¶ 16; Latson II Def.'s Mem. at 4, who was rated as

the "top candidate" for the position on September 21, 2012, see Latson II Def.'s Mot., Ex. H

(MPB Deliberations, September 21, 2012 ("2012 Jacksonville Deliberations at 2–3.  The Board

interviewed the plaintiff for the Tucson and Greensboro vacancies on December 27, 2012, see Latson II Def.'s Mot., Ex. F (Latson II Latson Decl.) ¶ 16, and selected Edward Courtney for the Greensboro position and Daniel McAdam for the Tucson position, see id., Ex. O (MPB Deliberations: Area Supervisor Greensboro, Area Supervisor Tucson ("Greensboro and Tucson Deliberations")) at 2; id., Ex. P (Declaration of Mark Williams ("Williams Decl.")) ¶ 13.  Both Courtney and McAdams are white males.  See id., Ex. V (Declaration of Robin D. McBeth ("McBeth Decl.")) at 32.

Following her non-selections for the 2012 Tucson, Greensboro, and Jacksonville positions, the plaintiff filed another EEO complaint with the Bureau's EEO Office,[4] alleging unlawful discrimination and retaliation.  Latson II Compl. ¶ 6; Latson II Def.'s Mem. at 7. Following another investigation, the matter was assigned to the same EEOC Administrative Law Judge who presided over the plaintiff's 2009 EEO complaint, and who "issued a Decision in favor of the [Bureau] on July 14, 2014."  Latson II Compl. ¶ 7; Latson II Def.'s Mem. at 7.  On August 25, 2014, the Department of Justice issued a Final Agency Decision affirming and adopting the EEOC's determination.  Latson II Compl. ¶ 8; Latson II Def.'s Mem. at 7–8.

---

[4] The plaintiff asserts in her Latson II Complaint that she filed her EEO complaint on November 2, 2012, see Latson II Compl. ¶ 6, a fact that the government does not dispute, see Latson II Def.'s Mem. at 7; see also Latson II Def.'s Mot., Ex. W (Latson II Ferguson-Russ Decl.) ¶ 3.  The Court, however, doubts that the plaintiff's EEO complaint was filed on November 2, 2012, because that complaint challenged her non-selections in Tucson and Greensboro, see Latson II Compl. ¶ 6, decisions which did not occur until December 28, 2012, see Latson II Def.'s Mot., Ex. O (Greensboro and Tucson Deliberations) at 2, and the plaintiff's EEO case was assigned a 2013 case number, see id., Ex. W (Latson II Ferguson-Russ Decl.) ¶ 3.  Because neither party attached the plaintiff's EEO complaint to their filings as an exhibit, the Court is unable to verify the EEO complaint's exact date.  This lack of clarity surrounding the date does not appear to raise an issue of exhaustion of administrative remedies, however, because the EEO Deputy Chief's declaration makes clear that the Bureau's EEO Office investigated the plaintiff's claims regarding her non-selection for the Tucson and Greensboro vacancies.  See id., Ex. W (Latson II Ferguson-Russ Decl.) ¶¶ 4–6.

The plaintiff filed her Complaint in <u>Latson I</u> on March 6, 2014, asserting claims of discrimination based on her race, gender, and color, as well as for retaliation.[5] <u>Latson I</u> Compl. ¶¶ 1, 28–40; <u>Latson I</u> Def.'s Facts ¶ 3.  The plaintiff subsequently filed her Complaint in <u>Latson II</u> on November 7, 2014, asserting claims of discrimination based on her race, gender, and color, as well as for retaliation, and utilization of a practice of promoting employees that has a disparate impact on African Americans and women.  <u>Latson II</u> Compl. ¶¶ 1, 35–48; <u>Latson II</u> Def.'s Facts ¶ 3.

## II.      STANDARD OF REVIEW

Courts will grant a motion for summary judgment under Federal Rule of Civil Procedure 56 if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(a), (c).  When ruling on a Rule 56 motion, the Court must view the evidence in the light most favorable to the non-moving party.  <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 150 (2000)).  The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true.  <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 255 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Accordingly, the non-moving party must not rely on "mere allegations or denials . . . but . . . must set forth specific facts

---

[5] On March 9, 2015, the Court dismissed the plaintiff's age and disability claims due to her failure to exhaust her administrative remedies with respect to those claims.  <u>See</u> <u>Latson I</u> Memorandum Opinion at 10, 13 (March 9, 2015).

showing that there [are] genuine issue[s] for trial."  <u>Anderson</u>, 477 U.S. at 248 (second omission

in original) (citation and internal quotation marks omitted).  "The mere existence of a scintilla of

evidence in support of the [non-moving party's] position [is] insufficient" to withstand a motion

for summary judgment, as "there must be [some] evidence on which the jury could reasonably

find for the [non-movant]."  <u>Id.</u> at 252.

## III.   ANALYSIS

### A.     The Plaintiff's Disparate Treatment Claims

Title VII protects federal employees from discrimination on the basis of race or gender,

among other factors.  <u>See</u> 42 U.S.C. § 2000e-16(a).  In the absence of direct evidence of

discrimination, as is the situation here, claims of employment discrimination under Title VII are

analyzed under the three-part framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792

(1973).  <u>Jackson v. Gonzales</u>, 496 F.3d 703, 706 (D.C. Cir. 2007).  Under this framework, the

plaintiff bears the initial burden of establishing a prima facie case of discrimination, by providing

proof of "(1) membership in a protected group; (2) qualification for the job in question; (3) an

adverse employment action; and (4) circumstances that support an inference of discrimination."

<u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 510 (2002) (internal citations omitted).  If the

plaintiff establishes a prima facie case, "[t]he burden then must shift to the employer to articulate

some legitimate, nondiscriminatory reason for the [adverse employment action]."  <u>McDonnell</u>

<u>Douglas</u>, 411 U.S. at 802.  Once the employer offers a legitimate, nondiscriminatory justification

for its action, "the <u>McDonnell Douglas</u> framework—with its presumptions and burdens—

disappears, and the sole remaining issue is discrimination <u>vel non</u>."  <u>Jackson</u>, 496 F.3d at 707

(internal citation and quotation marks omitted).  Thus, after the employer makes such a showing,

"the plaintiff must prove that a reasonable jury could infer that the employer's given explanation

was pretextual and that this pretext shielded discriminatory motives." Id. (internal citations omitted).

Where the defendant "has asserted a legitimate, nondiscriminatory reason" for the adverse employment action in the context of a summary judgment motion, see infra at 7, "the [ ] court need not—and should not—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). Rather, the Court must evaluate only whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason [for the adverse employment action] and that the employer intentionally discriminated against the employee on the basis of race." Evans v. Sebelius, 716 F.3d 617, 620 (D.C. Cir. 2013) (citation omitted). Typically, plaintiffs rely on one of two types of evidence to establish pretext: (1) "the employee may attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision," or (2) "the employee attempts to produce evidence suggesting that the employer treated other employees of a different race, color, religion, [gender], or national origin more favorably in the same factual circumstances." Brady, 520 F.3d at 495 (internal citations omitted); see also Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO, 548 F.3d 137, 144 (D.C. Cir. 2008) ("A plaintiff, who retains the burden of persuasion throughout, may show pretext in a number of ways, including by offering evidence of more favorable treatment of similarly situated persons who are not members of the protected class or that the employer is lying about the proffered justification." (citations omitted)). If the plaintiff fails to present such evidence, summary judgment must be granted for the employer. Paquin v. Fed. Nat'l Mortg. Ass'n, 119 F.3d 23, 27–28 (D.C. Cir. 1997).

Here, the plaintiff alleges that her "evidence demonstrate[s her] [s]uperior qualifications and [Bureau] experience," as compared to the qualifications and experience of the candidates ultimately selected, Pl.'s Opp'n at 9, and that the Bureau "select[ed] the same implicitly biased majority white [Board] members for their hiring process," which the plaintiff contends "affected [the Board's] decision making," id. at 11.  In response, the government contends that it had a legitimate, non-discriminatory reason for not selecting the plaintiff for any of the five vacancies; namely, that she was not the most qualified candidate, Latson I Def.'s Mem. at 1, 10–11; Latson II Def.'s Mem. at 1, 11–15, and that the plaintiff has failed to offer any evidence "other than her subjective beliefs" to demonstrate that she was more qualified for the positions, but not hired due to her race or gender, Latson I Def.'s Mem. at 14; Latson II Def.'s Mem. at 11.  The Court agrees with the government.

1.    **The 2009 Jacksonville Vacancy**

The members of the Board were unanimous in selecting Paul Brown as their "top candidate" for the 2009 Jacksonville vacancy on August 13, 2009, see Latson I Def.'s Mot., Ex. H (2009 Jacksonville Deliberations) at 1.  The Board's deliberation notes show that its members thought that Brown "demonstrated strong leadership skills," a "strong grasp of tech[nical] matters," and was "well prepared" for the interview.  Id., Ex. H (2009 Jacksonville Deliberations) at 1.

The Board members represented that they did not select the plaintiff for the position "because she performed poorly during her oral interview.  Her answers did not demonstrate leadership skills or technical knowledge.  She was not able to answer one of the questions because she did not understand it.  Her responses to several questions did not answer the question asked."  Id., Ex. O (Declaration of Megan A. Bennett ("Bennett Decl.")) ¶ 12; see also

id., Ex. P (Declaration of Chad Yoder ("Yoder Decl.")) ¶ 12 ("I did not select [the plaintiff] as my top choice because she did not demonstrate strong organizational awareness or strong technical competency."); id., Ex. Q (Declaration of Julia Dolan ("Dolan Decl.")) ¶ 12 ("I did not select [the plaintiff] as my top choice because she seemed to have less leadership ability than the selected candidate.  Information from her application packet and from her supervisor indicated that she could grow into the position with sufficient mentoring.").  In addition,

> [t]he Questionnaire for the Present Supervisor form for . . . Brown indicate[d] that [ ] Brown's supervisor at the time rated him as "high" in eight of the nine leadership competencies.  [The plaintiff's] supervisor rated her as "high" in six of the nine Leadership Competencies.  While [ ] Brown rated "high" on the three leadership competencies that [the Special Agent in Charge] stated the selectee should have, [the plaintiff] only rated "high" in one of the competencies.

Id., Ex. O (Bennett Decl.) ¶ 9.

### 2.     The Harrisburg Vacancy

Four of the five Board members selected Ernest Lintner as their "top candidate" for the Harrisburg vacancy in its first round of deliberations on December 17, 2009, see Latson I Def.'s Mot., Ex. Y (Harrisburg Deliberations) at 1, and all five selected Lintner as their "top candidate" in the second round, id., Ex. Y (Harrisburg Deliberations) at 2.  The Board's deliberation notes show that the Board members thought that Lintner "hit it out of the park," was "ready mentally to lead" despite only having two years of field experience, and would "be an effective supervisor."  Id., Ex. Y (Harrisburg Deliberations) at 1.  Lintner's supervisor rated Lintner as "high" in all nine leadership competencies, stated that he would be an "excellent choice," and that the Bureau "would do well to have him as a supervisor."  Id., Ex. Y (Harrisburg Deliberations) at 7.

The plaintiff's supervisor rated her "average–high" in one leadership competency

category, "average" in seven[6] other leadership competency categories, did not rate her on the

final leadership competency category—"leads others"—because she held a "one-person post,"

and opined that the plaintiff "would be average" "as a supervisor." Id., Ex. Y (Harrisburg

Deliberations) at 6.  One Board member stated that he "did not select [the plaintiff] as [his] top

choice because she did not demonstrate strong organizational awareness or strong technical

competency," while Lintner "did demonstrate organizational awareness and technical

competency." Id., Ex. P (Yoder Decl.) ¶¶ 22–23.  Another Board member stated that he "did not

select [the plaintiff] as [his] top choice because of her less than stellar interview responses—most

of her responses appear[ed] to have been read from prepared notes, her supervisor's rating of her

as 'average' and, in my opinion, she was not the best applicant for the position." Id., Ex. R

(Declaration of Mark Williams ("Williams Decl.")) ¶ 12.  And the only Board member who did

not initially select Lintner as her "top candidate" stated that she was "not impressed w[ith the

plaintiff]." Id., Ex. Y (Harrisburg Deliberations) at 1.

### 3.        The 2012 Jacksonville Vacancy

The Board members selected Margaret Carvill for the 2012 Jacksonville vacancy in the

first round of deliberations on September 21, 2012.  Latson II Def.'s Mot., Ex. H (2012

Jacksonville Deliberations) at 2–3.  The Board discussed only two candidates, Carvill and Karen

Montgomery, who was ultimately selected for another Area Supervisor position in Cincinnati.

Id., Ex. H (2012 Jacksonville Deliberations) at 2–3.  The Board stated that Carvill was "[v]ery

thoughtful in her responses," "would [ ] do well in a supervisory position," and "has a lot of

---

[6] It appears that in two of the seven leadership competency categories on which the plaintiff's supervisor rated her as "average," that he may have initially contemplated rating the plaintiff as "average–high," but then crossed out that choice and instead selected "average."  See Latson I Def.'s Mot., Ex. Y (Harrisburg Deliberations) at 6.  In any event, even if the plaintiff's supervisor had rated the plaintiff as "average–high" in those two competencies, Lintner still scored higher than the plaintiff.  Compare id., Ex. Y (Harrisburg Deliberations) at 6 with id., Ex. Y (Harrisburg Deliberations) at 7.

experience, which [the Jacksonville] office will need." Id., Ex. H (2012 Jacksonville Deliberations) at 2–3.  Specifically, Carvill had been an "acting supervisor and doing a good job for almost [sixteen] months." Id., Ex. H (2012 Jacksonville Deliberations) at 3.  One Board member gave the following reasons for selecting Carvill:

1.  She had the most Acting Area Supervisor experience out of all of the candidates.

2.  She provided more extensive details and examples of this experience during her interview.

3.  She was better prepared for the interview.

4.  She detailed more experience handling adverse actions, reviewing inspections reports, and conducting multiple and complex compliance investigations.

5.  She did a better job conveying her judgment when it came to the situational/hypothetical questions.

6.  She did a better job describing her teamwork with the other Investigators in the Grand Rapids office.

Id., Ex. I (Declaration of Aaron Gerber ("Gerber Decl.")) ¶ 12.

The Board did not discuss the substance of the plaintiff's interview during its deliberations. See id., Ex. H (2012 Jacksonville Deliberations) at 2–3; id., Ex. D (Declaration of Robin McBeth ("McBeth Decl.")) ¶ 13; id., Ex. I (Gerber Decl.) ¶ 14 (noting that the Board discussed whether or not the plaintiff was also being interviewed for an Area Supervisor position in Sacramento; after determining that she would only be interviewing for positions in Jacksonville and Cincinnati, "[t]hat was the extent of the discussion held by the [Board] in regard to the [plaintiff]").  Another Board member stated that the plaintiff was his "third choice" for the position, after Carvill and Montgomery, because "[the plaintiff] had a better interview than the remaining candidate." Id., Ex. I (Gerber Decl.) ¶ 13.

### 4.     The Tucson & Greensboro Vacancies

A single Board conducted the interviews and selected the prevailing candidates for both the Tucson and Greensboro vacancies after a single deliberation on December 28, 2012.  See id., Ex. O (Greensboro and Tucson Deliberations) at 1; Ex. P (Williams Decl.) ¶ 8.  The plaintiff interviewed for both positions, see id., Ex. O (Greensboro and Tucson Deliberations) at 1, but the Board ultimately selected Edward Courtney for the Greensboro position and Daniel McAdam for the Tucson position, see id., Ex. O (Greensboro and Tucson Deliberations) at 2; id., Ex. P (Williams Decl.) ¶ 13.  Courtney and McAdam were the only candidates discussed by the Board for the Greensboro position.  See id., Ex. O (Greensboro and Tucson Deliberations) at 1–2.

The Board chose Courtney for the Greensboro position because "he interviewed very well," "[h]ad a lot of foundational/technical skills that he can bring to this job," and "ha[d] the teaching experience, and respect in the office."  Id., Ex. O (Greensboro and Tucson Deliberations) at 2.  One Board member selected Courtney because

> [t]he amount of acting Area Supervisor experience was important to me.  [ ] Courtney exceeded the others in terms of acting supervisor experience.  He had instructed on laws and regulations at the Academy.  Those in the Greensboro Office looked up to him as a responsible person.  He excelled in everything he did.

Id., Ex. Q (Declaration of Carlton E. Bowers ("Bowers Decl.")) ¶ 11.  The Board chose McAdams for the Tucson position because he had "external supervisory experience," Id., Ex. O (Greensboro and Tucson Deliberations) at 2, and "McAdams's responses indicated he would be a better supervisor," id., Ex. Q (Bowers Decl.) ¶ 21; see also id., Ex. O (Greensboro and Tucson Deliberations) at 2 ("[McAdams] brought the communication skills to the table and his sharing experiences on communication and expectations was impressive.").

In regards to the Tucson position, one Board member said that the plaintiff "struck [her] as the top [choice] after hearing . . . [about] the needs of [the] office," but that same Board

member was "concerned that a lot of [the plaintiff's] information shared in the interview seemed a bit scripted." Id., Ex. O (Greensboro and Tucson Deliberations) at 2. Two other Board members agreed that the plaintiff's responses were "very" or "quite" scripted. Id., Ex. O (Greensboro and Tucson Deliberations) at 2; see also id., Ex. P (Williams Decl.) ¶ 15 ("The only thing I can recall concerning the [plaintiff] that was discussed in open forum was the manner in which she responded to the interview questions. It was voiced by a[t] least a couple of [Board] members that the [plaintiff's] responses were 'scripted.' I remember voicing my opinion to members of the group that I believed that, on several occasions, the [plaintiff] was 'reading' her responses."). Another Board member stated that the plaintiff was his second choice after McAdam for the Tucson position, id., Ex. O (Greensboro and Tucson Deliberations) at 2, and "probably [his] third choice" after McAdam and Courtney for the Greensboro position, id., Ex. Q (Bowers Decl.) ¶¶ 10, 12.

### 5.    Disparate Treatment Analysis

The Court concludes that the Bureau has satisfied its burden under Brady by producing sufficient evidence showing that the plaintiff was not selected for any of the vacancies because she was not the most qualified candidate, and not for any discriminatory reason. According to the evidence, applicants other than the plaintiff were selected for the vacancies due to their superior leadership skills, supervisory experience, and interview performances. See generally Latson I Def.'s Mot., Ex. H (2009 Jacksonville Deliberations) at 1 (noting Brown's "strong leadership skills," "strong grasp of tech[nical] matters," and that he was "well prepared" for the interview); id., Ex. Y (Harrisburg Deliberations) at 1 (noting that Lintner "hit it out of the park," was "ready mentally to lead" despite having only two years of field experience, and would "be an effective supervisor"); Latson II Def.'s Mot, Ex. I (Gerber Decl.) ¶ 12 (noting that Carvill

"had the most Acting Area Supervisor experience" and "was better prepared for the interview");
id., Ex. Q (Bowers Decl.) ¶ 11 ("Courtney exceeded the others in terms of acting supervisor
experience."); id., Ex. O (Greensboro and Tucson Deliberations) at 2 ("[McAdams] brought the
communication skills to the table and his sharing experiences on communication and
expectations was impressive.").

 In discussing three of the plaintiff's four interviews, Board members noted their concern
about the plaintiff seemingly reading from prepared notes, see Latson I Def.'s Mot., Ex. O
(Bennett Decl.) ¶ 12 (2009 Jacksonville interview); id., Ex. R (Williams Decl.) ¶ 12 (Harrisburg
interview); Latson II Def.'s Mot., Ex. O (Greensboro and Tucson Deliberations) at 2
(Greensboro and Tucson interview).  One Board member for the 2012 Jacksonville vacancy
explained the importance of Area Supervisor candidates not simply reading prepared responses:
"An Area Supervisor often talks in public and to industry members, so he/she must be prepared
to give presentations without relying extensively on his/her notes."  Latson II Def.'s Mot., Ex. I
(Gerber Decl.) ¶ 11; see also id., Ex. P (Williams Decl.) ¶ 12 ("The applicant must, I believe,
also demonstrate the ability to communicate effectively.  For the Area Supervisor position, the
interview should objectively rate applicants as to their ability to effectively communicate.").
Furthermore, it was noted that the plaintiff "did not demonstrate leadership skills or technical
knowledge" in her 2009 Jacksonville interview, see Latson I Def.'s Mot., Ex. O (Bennett Decl.)
¶ 12, and her supervisor did not rate the plaintiff as highly in leadership competency as compared
with the candidate chosen for the Harrisburg position, compare id., Ex. Y (Harrisburg Merit
Promotion Board Deliberations) at 7 (showing that Lintner rated "high" in nine leadership
capacities) with id., Ex. Y (Harrisburg Deliberations) at 6 (showing that the plaintiff rated "high"
in one leadership capacity).  "By arguing that [the candidates chosen] w[ere] more qualified, the

[Bureau] has asserted a legitimate, non-discriminatory reason for [the plaintiff's] non-promotion."  Thompson v. McDonald, 169 F. Supp. 3d 170, 180 (D.D.C. 2016).  Accordingly, to survive summary judgment, the plaintiff must show that a reasonable jury could conclude from all of the evidence "that the employer's asserted non-discriminatory reason was not the actual reason [for the adverse employment action,] and that the employer intentionally discriminated against the [plaintiff] on the basis of race[, color,] or [gender]."  Id. (quoting Brady, 520 F.3d at 494)).

Here, the plaintiff alleges, without citing to any specific evidence in the record, that her "evidence demonstrated [s]uperior qualifications and [Bureau] experience" as compared with the candidates ultimately selected for the several positions for which she applied.  Pl.'s Opp'n at 9.  This allegation, however, is alone insufficient to survive summary judgment.  As this Circuit has explained,

> [w]hen an employer says it made a hiring decision based on the relative qualifications of the candidates, "we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone."  Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc).  On the other hand, if a factfinder can conclude that a "reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture."  Id.; see also Holcomb, 433 F.3d at 897; Stewart v. Ashcroft, 352 F.3d 422, 429–30 (D.C. Cir. 2003).  Applying Aka, we have explained that "[i]n order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination."  Holcomb, 433 F.3d at 897.  To conclude otherwise would be to render the judiciary a "super-personnel department that reexamines an entity's business decisions"—a role we have repeatedly disclaimed.  See id. (quotation marks omitted).

Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007).  Here, the plaintiff fails to identify any evidence in the record that suggests that she was significantly better qualified for any of the Area Supervisor positions than the candidates selected for the positions.  See generally Pl.'s Opp'n at

16

10–12.  And because "a plaintiff's subjective assessment of [her] own record is largely irrelevant[,] . . . [her] lack of evidence concerning the candidates who were selected for promotion is fatal to h[er] qualifications-based argument."  Jo v. District of Columbia, 582 F. Supp. 2d 51, 62–63 (D.D.C. 2008); see also Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Short of finding that the employer's stated reason was indeed a pretext, however—and here one must beware of using 20/20 hindsight—the court must respect the employer's unfettered discretion to choose among qualified candidates.").  Furthermore, the Court's independent review of the record fails to disclose any evidence that suggests (1) a significant qualifications gap between the plaintiff and the candidates that were ultimately selected for the Area Supervisor positions, see Holcomb, 433 F.3d at 897, or (2) that the Bureau's stated reasons for hiring the other candidates over the plaintiff were pretextual, see Evans, 716 F.3d at 620.  Accordingly, the plaintiff has failed to produce any evidence to rebut the Bureau's explanation for hiring other candidates that would permit a reasonable jury to infer discrimination on the basis of race, color, or gender.[7]

## B.   The Plaintiff's Retaliation Claims

The plaintiff alleges that the Bureau retaliated against her because of her prior EEO activity when it did not select her for any of the five vacancies.  See Pl.'s Opp'n at 12–13.  The Bureau responds that the plaintiff cannot show temporal proximity between her protected activity

---

[7] The plaintiff also alleges that the Bureau "select[ed] the same implicitly biased majority white [Board] members for their hiring process[, and that t]heir implicit biases affected their decision making."  Pl.'s Opp'n at 11.  It is unclear whether this argument relates to the plaintiff's disparate treatment claim or her disparate impact claim, which is discussed infra at Part III.C.  To the extent that this argument concerns the plaintiff's disparate treatment claim, because conclusory allegations of discriminatory animus lacking any factual basis in the record—like conclusory statements about one's own employment qualifications—are insufficient to defeat summary judgment, this argument also fails.  See Hussain v. Nicholson, 435 F.3d 359, 365 (D.C. Cir. 2006) (concluding that the district court properly disregarded the plaintiff's "evidence of religious animus" because it "consisted merely of conclusory allegations in his own affidavit" (internal citation omitted)); see also Turner v. Shinseki, 824 F. Supp. 2d 99, 118 (D.D.C. 2011) (Walton, J.) (finding summary judgment for the defendant appropriate in light of the plaintiff's conclusory allegations and opinions that he was discriminated against on the basis of his race).

and her non-selections, see Latson I Def.'s Mem. at 14–17; Latson II Def.'s Mem. at 16–21, and

also that the defendant had legitimate, non-retaliatory reasons for not selecting the plaintiff for

any of the vacancies, see Latson I Def.'s Mem. at 17; Latson II Def.'s Mem. at 21.

"Where, as here, a plaintiff offers only circumstantial evidence of retaliation, her claim is

governed by the burden-shifting framework of McDonnell-Douglas." Solomon v. Vilsack, 763

F.3d 1, 14 (D.C. Cir. 2014). This framework requires the plaintiff to first establish a prima facie

case of retaliation by showing that "(1) she engaged in a statutorily protected activity; (2) she

suffered a materially adverse action by her employer; and (3) a causal connection existed

between the two." Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007). If the plaintiff

satisfies this burden, "the burden of production shifts to the employer to produce a 'legitimate,

nondiscriminatory reason' for its action." Solomon, 763 F.3d at 14 (quoting Wiley, 511 F.3d at

155). If the employer provides such a reason, the plaintiff must then counter with "sufficient

evidence to 'create[ ] a genuine dispute on the ultimate issue of retaliation either directly by

[showing] that a discriminatory reason more likely motivated the employer or indirectly by

showing that the employer's proffered explanation is unworthy of credence.'" Id. (quoting

Pardo–Kronemann v. Donovan, 601 F.3d 599, 604 (D.C. Cir. 2010)).

Once the employer comes "forward with a legitimate, non-retaliatory justification for [its]

actions," the burden shifting framework becomes irrelevant and the Court need not determine

whether the plaintiff established a prima facie case of retaliation. Id. As stated supra, see Part

III.A.5, the Bureau produced sufficient evidence that the plaintiff was not selected for any of the

vacancies because she was not the most qualified candidate, and not for any discriminatory

reason. Consequently, the Court need not decide whether the plaintiff can show temporal

proximity to establish her prima facie case, and shall proceed to the question of retaliation vel

<u>non</u>, as that "question is the ultimate factual issue in the case." <u>Solomon</u>, 763 F.3d at 14 (citations and quotation marks omitted).

Viewing the record in the light most favorable to the plaintiff as the non-moving party, the following are the facts pertinent to the plaintiff's claim of pretext: the plaintiff's protected activity prior to her application for the two 2009 vacancies was her EEO complaint that resulted in a settlement agreement on September 22, 2008, <u>see</u> <u>Latson I</u> Def.'s Mot., Ex. S (<u>Latson I</u> Ferguson-Russ Decl.) ¶ 4, and her protected activity prior to her application for the three 2012 vacancies was her EEO complaint that challenged the Board's selections for the two 2009 vacancies, <u>see</u> <u>Latson I</u> Compl. ¶ 6; <u>Latson I</u> Def.'s Mem. at 6.  Two of the Board members were aware of the plaintiff's prior EEO activity: Aaron Gerber, who was on the Board for the 2012 Jacksonville vacancy, <u>see</u> <u>Latson II</u> Def.'s Mot., Ex. I (Gerber Decl.) ¶¶ 6, 17, and Mark Williams, who was on the Board for the Greensboro and Tucson vacancies, <u>see</u> <u>id.</u>, Ex. P (Williams Decl.) ¶¶ 6, 21.  Both Gerber and Williams, however, denied that the plaintiff's protected activity played any role in their consideration of the plaintiff.  <u>See</u> <u>id.</u>, Ex. I (Gerber Decl.) ¶ 17; <u>id.</u>, Ex. P (Williams Decl.) ¶ 21.

In her opposition, the plaintiff does not point to any evidence to refute Gerber's and Williams's statements; rather, she merely opines that (1) Steven Zellers, a member of the 2009 Jacksonville Board, was biased against her because he had previously denied the plaintiff the opportunity to be reassigned to the Bureau's National Academy; (2) Chad Yoder, a member of the 2009 Jacksonville and Harrisburg Boards, "presented" undisclosed bias against the plaintiff; and (3) Charlayne Armentrout, a member of the Harrisburg Board, "presented" bias "based on subjectivity (personal opinions/feelings)" when she opined that she was "not impressed" with the plaintiff's candidacy.  <u>See</u> Pl.'s Opp'n at 12–13.  The plaintiff does not cite to any record

evidence showing that these three members even knew about her prior EEO activity, nor to any evidence that supports her allegations, see id., and thus, her conclusory allegations are insufficient to survive summary judgment, see Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Because [the plaintiff's] claim of retaliation rest[ed] entirely upon a conclusory representation, the district court was right to dismiss it."). Accordingly, the Bureau is entitled to summary judgment on the plaintiff's retaliation claims.

**C.      The Plaintiff's Disparate Impact Claim**

"Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." Ricci v. DeStefano, 557 U.S. 557, 577 (2009). "Under the disparate-impact statute, a plaintiff establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" Id. at 578 (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(i)). In other words, a plaintiff alleging a disparate impact claim "must first identify the specific employment practice that is challenged," and then "must establish causation; 'that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" Onyewuchi v. Mayorkas, 766 F. Supp. 2d 115, 130 (D.D.C. 2011) (quoting Watson v. Fort Worth Bank & Tr., 487 U.S. 977, 994 (1988)) (emphasis added), aff'd, No. 11-5099, 2011 WL 6759483 (D.C. Cir. Dec. 2, 2011). Simply put, to establish a prima facie case of disparate impact, the plaintiff must produce statistical evidence from which a reasonable jury could determine that the Bureau's utilized hiring policy caused the statistical disparity in question. See Watson, 487 U.S. at 997

(explaining that the "ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff at all times.").

The plaintiff's opposition did not contain any statistical evidence, see generally Pl.'s Opp'n, but on October 14, 2016, after summary judgment briefing had concluded, the Court granted the plaintiff leave to submit, for the Court's consideration, her Statistical Evidence, which the Court construed as a supplement to her opposition. See Latson II Order at 1 (Dec. 12, 2016). In that Order, the Court noted that the plaintiff "cites and primarily relies on" three reports in her Statistical Evidence, but that she actually "failed to submit any of these reports as exhibits." Id. "Rather, the majority of the plaintiff's attachment to her Statistical Evidence consists of tables of employment data without any titles or authenticating information." Id. at 1–2. Because the Court was "unsure whether this data is derived from the reports [cited by the plaintiff] or if the plaintiff compiled this data on her own," the Court ordered the plaintiff to file copies of the three reports "or direct the Court as to the precise means of accessing the reports." Id. at 2. In its Order, the Court advised the plaintiff that "[t]o survive summary judgment[,] the non-moving party must produce evidence . . . capable of being converted into admissible evidence," see id. (quoting Greer v. Paulson, 505 F.3d 1306, 1315 (D.C. Cir. 2007)), and that the latitude afforded to a pro se litigant "does not constitute a license for a plaintiff filing pro se to ignore the Federal Rules of Civil Procedure," id. (quoting Moore v. Agency for Int'l Dev., 994 F.2d 874, 876 (D.C. Cir. 1993)).

Thereafter, the plaintiff filed her updated Statistical Evidence, which consists of a primary document that appears to be identical to her original Statistical Evidence and thus relies on the same three reports, compare Pl.'s Updated Stats. with Pl.'s Stats., as well as two attachments, see Pl.'s Updated Stats. at 7–121. The first attachment is not labeled as an exhibit,

nor does it contain a cover page or any identifying information; rather, it is similar to the attachment to the plaintiff's original Statistical Evidence in that it "consists of [more] tables of employment data without any titles or authenticating information."  See Latson II Order at 1–2 (Dec. 12, 2016); Pl.'s Updated Stats. at 7–67.  The second attachment, which is labeled Exhibit 2, see Pl.'s Updated Stats. at 68, appears to be some sort of EEO report concerning the Bureau, but again, does not contain a cover page, see id. at 69.[8]

The Court agrees with the government that the plaintiff failed to comply with the Court's December 12, 2016 Order because she did not file the three reports or direct the Court to the precise means of accessing the reports.  See Latson II Order at 1 (Dec. 12, 2016); see also Def.'s Stats. Resp. at 3 ("The documents in [the p]laintiff's two exhibits are not the three reports that the Court had explicitly directed her to file.").[9]  Once again, the plaintiff has submitted purported statistical evidence that the Court cannot identify and review, much less rely upon.  See generally Pl.'s Updated Stats. at 7–121.  Thus, the Court has no choice but to conclude that the plaintiff has failed to submit statistical evidence to support her disparate impact claim.  Accordingly, the

---

[8] The government "assumes" that the plaintiff's first attachment is "a grouping of seven different 'Federal EEO Statistical Reports of Discrimination Complaints' from the Department of Justice in general and one report from the [Bureau] in particular," see Def.'s Stats. Resp. at 3 & n.4, and the government identifies Exhibit 2 as "a grouping of three separate documents," but notes that none of these documents are "the three reports that the Court had explicitly directed [the plaintiff] to file," id. at 3.

[9] The defendant filed a motion to extend the time to respond to the purported statistical evidence submitted by the plaintiff, see Latson II Defendant's Motion for Extension of Time at 1 (Jan. 18, 2017), which the Court granted, see Latson II Minute Order (Jan. 18, 2017).  After the government timely filed its response, the plaintiff filed a motion to strike the government's response on the grounds that "[t]he parties conferred under Local Civil Rule 7(m) and the [p]laintiff opposed [the d]efendant's Motion for Extension of Time."  Pl.'s Mot. at 1.  The Court notes that the government informed the Court of the plaintiff's opposition to the defendant's motion, see Latson II Defendant's Motion for Extension of Time at 1, and this is all that Local Civil Rule 7(m) requires, see Local Rule 7(m) ("Before filing any nondispositive motion in a civil action, counsel shall discuss the anticipated motion with opposing counsel in a good-faith effort to determine whether there is any opposition to the relief sought and, if there is, to narrow the areas of disagreement.  The duty to confer also applies to non-incarcerated parties appearing pro se.  A party shall include in its motion a statement that the required discussion occurred, and a statement as to whether the motion is opposed.").  Accordingly, the Court will deny the plaintiff's motion to strike.

plaintiff has failed to establish a prima facie case of disparate impact, and thus her claim must

fail.  See Martin v. District of Columbia, 78 F. Supp. 3d 279, 314 (D.D.C. 2015) (granting

summary judgment in favor of the defendant on the plaintiff's disparate impact claim because the

plaintiff "failed to introduce statistical evidence demonstrating causation").[10]

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the defendant's motions

for summary judgment and deny the plaintiff's motion to strike.

**SO ORDERED** this 9th day of March, 2017.[11]


REGGIE B. WALTON
United States District Judge

---

[10] The Court notes that, even if the plaintiff had submitted proper statistical evidence, her disparate impact claim would still fail because she failed to "identify the specific employment practice that is challenged."  Onyewuchi, 766 F. Supp. 2d at 130 (quoting Watson, 487 U.S. at 994).  The plaintiff alleges only that the Board's "selective decision making process" has a "disparate impact on minorities from advancing in their careers," as well as on "the lower selection and promotion rate of women in general."  See Pl.'s Updated Stats. at 2.  The Court agrees with the government that "there is no such process or procedure called [a] 'selective decision making process.'"  See Def.'s Stats. Resp. at 7; see also id., Gov. Attachment 1 (flowchart delineating the Board's multi-step process for hiring). Thus, the plaintiff has failed to identify a specific employment practice employed by the Board in its multi-step hiring process that is responsible for any alleged disparate impact.  See Onyewuchi, 766 F. Supp. 2d at 130–31 (noting that a plaintiff may challenge an entire employment practice only when "the elements of [that] decisionmaking process are not capable of separation for analysis").  Furthermore, the plaintiff has not identified an alternative selection process that would avoid the alleged disparate impact, see generally Pl.'s Updated Stats. at 1–5, and thus her claim must fail for that reason also, see Davis v. Ashcroft, 355 F. Supp. 2d 330, 344 (D.D.C. 2005) (Walton, J.) ("Assuming, without deciding, that the plaintiff has met her initial burden, her disparate impact discrimination claim nevertheless cannot be maintained because she has failed to set forth an alternative practice which would avoid the alleged disparate impact.").

[11] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.